## THE PAVONIA.[1]

*(District Court, S. D. New York. February 27, 1885.)*

1. COLLISION—MISCALCULATION OF PILOT—LOOKOUT.

The ferry-boat P. was approaching her New York slip on the North river on a strong flood-tide, which compelled her to go below her slip and swing into it as the tide swept her up. The ferry-boat W., running on a different ferry, at this moment came out of her slip, 744 feet below that of the P. It was the custom of the W. to go to the right of the P. on such occasions, if the P. were "well out" in the river, otherwise to go to the left. On this occasion, the pilot of the W., judging that the P. was well out in the stream, attempted to go to the right, when the P. was already swinging in, and in about 45 seconds after leaving her slip struck the W. on her port side. The pilot of the P. was giving his entire attention to making his slip; the deck hand who should have acted as lookout was under the hood, and did not see or report the W. until a few seconds before collision, when the P., too late, reversed full speed. *Held,* that the W. was in fault in misjudging the distance of the P. and in attempting to go inside and across her bows; and that the P. was in fault in not having a lookout besides the pilot properly stationed and attentive to his duties; and that the damages should be divided.

2. SAME—FERRY-BOATS—NECESSITY OF LOOKOUT.

The legal obligation of ferry-boats to maintain an efficient lookout has been repeatedly declared, and can never be relaxed.

In Admiralty.

*Abbett & Fuller,* for libelants.

*Wilcox, Adams & Macklin,* for claimants.

BROWN, J. At about 6:30 P. M. on the fifteenth of October, 1883, as the Erie ferry-boat Pavonia was approaching her slip at the foot of Chambers street on the North river, she ran into the starboard side of the ferry-boat Weehawken, of the Hoboken ferry, running from the foot of Barclay street. This libel was filed for the recovery of the damages arising from the collision. The tide was strong flood, and the wind heavy from the north-west. It was dusk; but bright moonlight and clear. The upper side of the Barclay-street slip is 744 feet below the upper corner of the Providence pier, which forms the lower side of the Chambers-street slip. The Pavonia was intending to make the upper division of the Chambers-street slip; the lower division being occupied by her sister boat. The flood-tide, at its strength, sweeps past these piers at about the rate of three knots or over. To make their landings on the New York shore at such a time,

---

[1] Reported by R. D. & Edward Benedict, Esqs., of the New York bar.

the ferry-boats from the west shore usually go somewhat below the slip, and run into it as they drift upwards. Such, according to the testimony of the witnesses on the part of the Pavonia, was her course at this time. Every natural probability gives it credit, there being no obstructions in the way. The pilot testifies that before making his final swing to run into the slip, he looked to see if the Barclay-street boat was coming out, it being time for her, but could not see her; that he then put his wheel hard a-starboard, and swung for his slip, to which he gave his whole attention, until the Weehawken appeared very near to him, when he reversed his engine, but not in season to stop and prevent the collision; and that the collision took place within 100 or 200 feet of the end of the Providence pier and opposite to it.

On the part of the Weehawken it is admitted that, inasmuch as the boats cross each other's course, the established practice is that the Barclay-street boats on a flood-tide shall pass inside, that is, to the right, if the Erie boats are at the time "well out" in the river, i. e., 1,000 feet or upwards; but that otherwise they must go outside of the Erie boats in order to permit the latter to make their landings. This is a manifest necessity to which, under rule 24, the prior rules give way. Her witnesses say that as the Weehawken left her slip the Pavonia was "well out" in the river; that she had not got down as far as the Chambers-street slip, and had not commenced her turn for the slip, which she would not usually do until she had passed below Chambers street; that the collision itself took place some 400 or 500 feet out in the river, opposite the Erie pier, which forms the upper side of the Chambers-street slip, and occurred in consequence of the Pavonia's turning rapidly about, under a starboard helm, and trying to run ahead of the Weehawken. There is considerable testimony on the part of the Weehawken to sustain this theory and the place of the collision as alleged in her behalf. Repeated consideration of the testimony compels me to reject this account as to the place of the collision. I am satisfied it was opposite, or very nearly opposite, the Providence pier, on the lower side of the slip, or a little only above it, and occurred as the Pavonia was coming in her usual course to make the upper rack, and that it was not more than 200 feet outside of the lower pier. The boats, doubtless, within half a minute after had drifted up abreast of the upper pier, and thereby had come nearly into the position testified to by the Weehawken's witnesses, except as to distance out in the river.

The testimony of the pilot of the Secaucus, which lay out in the stream, is referred to as establishing the position of the boats opposite the upper pier at the time of the collision, because the pilot testifies that he could see the bridge of the slip astern of the boats. This, however, is not of much weight, unless the exact position of the Secaucus were known, and that is as liable to error as the position of the Pavonia; and also because, as I have said, the boats drifted im-

mediately to the upper pier, and the Weehawken, being under full headway, would have passed from one pier to the other in about 15 seconds.

There are circumstances that strongly confirm the account of the Pavonia as to the place of the collision. Her pilot, not seeing the Weehawken, had no reason to keep off; nor, on the other hand, is there the slightest probability that, not seeing her, he would have changed his course to run into his slip at a point where it was impossible for him to make the slip. Had the Weehawken been in the position her witnesses allege, there is no conceivable reason why the Pavonia should not have continued down river in the usual manner, until she had passed somewhat below Chambers street, before her final turn for her slip. On the other hand, if the pilot's statement that he did not see the Weehawken is untrue, and if he did see her, it is not credible that he would depart from his usual course to go below Chambers street before turning, so as to be unable to make his own slip, and at the same time so as to run into the Weehawken. All the probabilities of the case, therefore, sustain the witnesses of the Pavonia as to their position nearly opposite the Providence pier at the time when the boats first collided. If that was the place of collision, the fault of the Weehawken necessarily follows; for the time that elapsed after the Weehawken left her slip until she reached the Providence pier, only 744 feet distant, considering the flood-tide, could not have been upwards of 45 seconds; and during this time the Pavonia could not possibly have come inwards more than 500 or 600 feet, at the most, across the tide; so that she could not, at the time the Weehawken left her slip, have been "well out" in the river, so as to justify the Weehawken in undertaking to go inside. The result proves that the pilot of the Weehawken miscalculated her distance out. Considering the nearness of the Pavonia to her slip, and that she was already on her swing, I conclude that it was the duty of the Weehawken to have waited and passed outside.

I cannot acquit the Pavonia of the charge of negligence in not having an efficient lookout. Assuming it to be true, as the pilot states, that just before he made his final swing for the slip he looked for the Barclay-street boats and saw none coming out, it is clear that it must have been very nearly at the same time, at all events but a few seconds afterwards, that the Weehawken started out. The Pavonia's lights, and the changes in them that the pilot of the Weehawken saw, show that she was then just commencing her final swing. From that time the pilot was, as he says, required to give all his attention to make his slip. That made an efficient lookout the more indispensable from that moment onward. The legal obligation of ferry-boats to maintain an efficient lookout has been repeatedly declared, and considering the lives that are endangered through collisions this rule can never be relaxed. *The Monticello*, 15 FED. REP. 474, and cases cited. There was a deck hand whose duty it was

to act as lookout; but it is clear that he was not performing his duty as such, nor in the proper place for performing it, but was under the hood. If he had been doing his duty, the Weehawken would have been seen coming out of her slip and reported three-quarters of a minute at least before the collision. Had she been thus observed and reported at that time, the Pavonia, by reversing her engine at once, instead of waiting until half this interval had passed, would very clearly either have been stopped altogether before the collision, or else would not have reached the place of the collision until the Weehawken had passed by, which would have been accomplished 10 seconds later. Both boats must, therefore, be held in fault, and the damages divided.